**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

IN RE AGAPE LITIGATION

This Document Relates to: All Actions

Master File No: 09-CV-1606
(ADS)(AKT)

--------------------------------------------------------X
--------------------------------------------------------X

ADRIANNE CLARKE, TL HORIZONS LLC,
MAXIMILIAN ENTERPRISES LLC and EQUITY
TRUST COMPANY CUSTODIAN fbo Adrianne
Clark IRA,

                                Plaintiffs,

                -against-

NICHOLAS COSMO, AGAPE WORLD INC.,
AGAPE MERCHANT ADVANCE LLC, AGAPE
WORLD LLC, ANTHONY MASSARO, JASON
KERYC, DAVID PETRY, HUGO LEON ARIAS,
SEBASTIAN TAUZ, MARTY HARTMANN, SR.,
MARTY HARTMANN, JR., ELIZABETH (last
name unknown), LAURIE SAVARESE, BANK OF
AMERICA, N.A., MF GLOBAL, INC., ALARON
TRADING CORPORATION d/b/a ALARON
FUTURES & OPTIONS, XYZ CORPS 1-10,
JOHN DOE 1-10, JANE DOE 8A, COMPANY 1,
COMPANY 2, and JOHN DOES 11-200,

                                Defendants.

09-CV-1782 (ADS)(AKT)

--------------------------------------------------------X

```
------------------------------------------------------------X
```

SEAN LEGURNIC,

09-CV-1436 (ADS)(AKT)

                Plaintiff,

        -against-

SALVATORE CICCONE individually and in his
official capacity as an Officer of AGAPE WORLD,
INC., ANTHONY CICCONE individually and in
his capacity as an Officer of AGAPE WORLD,
INC., NICHOLAS COSMO, individually and in his
capacity as President of AGAPE WORLD, INC.,
AGAPE WORLD INC., AGAPE MERCHANT
ADVANCE LLC, PREMIUM PROTECTION
PLAN, LLC, BANK OF AMERICA, N.A., MF
GLOBAL, INC., ALARON TRADING
CORPORATION, d/b/a ALARON FUTURES &
OPTIONS, COMPANIES 1-10, and JOHN DOES
1-10,

                Defendants.
```
------------------------------------------------------------X
```

**APPEARANCES:**

**Coughlin Stoia Geller Rudman & Robbins LLP**
Attorneys for the Class Action Plaintiffs
58 South Service Road, Suite 200
Melville, NY 11747
      By: Edward Y. Kroub, Esq.
         Robert M. Rothman, Esq., Of Counsel

**Law Offices of Christopher J. Gray, P.C.**
Attorneys for the Class Action Plaintiffs
460 Park Avenue, 21st floor
New York, NY 10022
      By: Christopher J. Gray, Esq., Of Counsel

**Louis F. Burke P.C.**
Attorneys for the Class Action Plaintiffs
460 Park Avenue, 21st Floor
New York, NY 10022
       By: Louis F. Burke, Esq., Of Counsel

**Edward K. Blodnick & Associates, P.C.**
Attorneys for the Clarke Plaintiffs
1205 Franklin Avenue, Suite 110
Garden City, NY 11530
       By: Edward K. Blodnick, Esq., Of Counsel

**Law Offices of Anthony C. Donofrio**
Attorneys for Plaintiff Sean Legurnic
5518 Merrick Road
Massapequa, NY 11758
       By: Anthony C. Donofrio, Esq., Of Counsel

**Tacopina & Siegel, PC**
Attorneys for Defendant Anthony Massaro
275 Madison Avenue, 35th Floor
New York, NY 10016
       By: Chad D. Siegel, Esq., Of Counsel

**Law Office of Ira S. Newman**
Attorneys for Defendant Sebastian Tauz
98 Cutter Mill Road, Suite 441 South
Great Neck, NY 11021
       By: Ira S. Newman, Esq., Of Counsel

**Law Offices of Howard E. Greenberg, P.C.**
Attorneys for Defendants Marty Hartmann, Sr. and Marty Hartmann, Jr.
180 East Main Street, Suite 308
Smithtown, NY 11787
       By: Howard E. Greenberg, Esq., Of Counsel

**Arnold & Porter LLP**
Attorneys for Defendant Bank of America, N.A.
399 Park Avenue
New York, NY 10020-4690
        By: Michael D. Schissel, Esq.
            Erik Christopher Walsh, Esq.
            Pamela Addison Miller, Esq., Of Counsel

**Katten Muchin Zavis Rosenman**
Attorneys for Defendant MF Global, Inc.
575 Madison Ave.
New York, NY 10022
        By: Anthony L. Paccione, Esq.
            Matthew D. Parrott, Esq.
            Bonnie Lynn Chmil, Esq., Of Counsel


**SPATT, District Judge**.

    These three cases, In re Agape Litigation, 09-CV-1606 ("the Class Action

Complaint"), Clarke, et al v. Cosmo, et al., 09-CV-1782 ("the Clarke Complaint"),

and Legurnic v. Ciccone, et al., 09-CV-1436 ("the Legurnic Complaint"), all arise in

connection with a now well-publicized Ponzi scheme allegedly perpetrated by

Defendant Nicholas Cosmo ("Cosmo").  See Robert E. Kessler, President of N.Y.

Investment Firm Charged in Ponzi Scheme, Document Shows, Newsday, January 27,

2009, at A4.  In addition to Cosmo, each of these Complaints name various other

defendants, including Bank of America, N.A. ("BOA") and MF Global, Inc. ("MF

Global").  In particular, all three Complaints allege claims against BOA and MF

Global for: (1) common law negligence; (2) aiding and abetting fraud; and (3) aiding

and abetting a breach of fiduciary duty.  The Class Action Complaint asserts an

4

additional claim against BOA and MF Global for aiding and abetting commodities fraud while the Clarke Complaint adds RICO and RICO conspiracy claims against both companies.

Presently before the Court are motions by BOA and MF Global to dismiss the three Complaints under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, their motions are granted. However, the Court will afford the Plaintiffs one opportunity to amend their pleadings for the sole purpose of adding new factual allegations that bear on their claims against BOA for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.

## I.  BACKGROUND

The following factual background is derived from the allegations contained in the Plaintiffs' three Complaints. The allegations are assumed to be true for the purposes of these motions.

### A.  The Ponzi Scheme Operated by Nicholas Cosmo

On January 15, 1999, this Court sentenced Cosmo to 21-months imprisonment and three years of supervised release after he pleaded guilty to fraud. As a result of his conviction, Cosmo, then a stock-broker, was stripped of his license to deal securities and was barred from associating with any investment broker-dealer. Not long after completing his term of supervised release, Cosmo formed Agape World, Inc. ("Agape").

From October of 2003 through his most recent arrest in January of 2009, Cosmo devised and orchestrated a Ponzi scheme through Agape and various other entities under his control.  Agape held itself out as a company that provided short-term bridge loans to businesses and individuals that were unable to obtain financing from commercial banks.  Through direct solicitation and various brokers, Agape was able to raise an estimated $400 million by promising investors enticing short-term returns of 12 to 15%.

In actuality, although Agape received approximately $400 million from investors between October of 2003 and January of 2009, the company made only approximately $25 million in loans.  Large returns paid to early investors simply came from money paid by subsequent investors.  Cosmo used the investments to finance a lavish lifestyle and pay Agape brokers handsome commissions for soliciting new investors.  In order to compensate for the lack of revenue from legitimate loans, Cosmo used investor money to make risky bets in the commodities market.  In the process, he lost approximately $80 million.

On January 26, 2009, Cosmo was arrested and charged with wire fraud and mail fraud.  The United States Commodity Futures Trading Commission ("CFTC") has also commenced an action against Cosmo and Agape, alleging that they defrauded customers in violation of the Commodity Exchange Act ("CEA").

**B. The Allegations Against Bank of America**

Cosmo and Agape had a relationship with a BOA branch office in West Hempstead, New York. In light of this relationship, BOA effectively established an unofficial branch within Agape headquarters in Hauppauge, New York to provide on-site banking services. The branch was staffed by one unnamed BOA employee and was dedicated solely to Agape's "needs and purposes." Class Action Compl. ¶ 53; Legurnic Compl. ¶ 64; Clarke Compl. ¶ 110. Located within Agape's office space, this branch had full access to BOA's systems and possessed the ordinary capabilities of a conventional BOA branch. The BOA employee at Agape's headquarters had access to Agape's business records and personal contact with Agape employees, including Cosmo.

Agape and BOA also shared proprietary information. For example, Agape investors noticed that they would receive solicitations from Agape and Cosmo whenever they held large deposits in their BOA accounts. According to the Plaintiffs, this account information permitted Agape to engage in direct and targeted solicitations of BOA customers. In turn, Agape investors received solicitations from BOA regarding credit cards, mortgages, and investment products. The Plaintiffs also allege that an unnamed BOA representatives endorsed Agape and Cosmo. In particular, one BOA representative who previously worked at the West Hempstead branch told an

unnamed investor that Agape was a "wonderful company" and that Cosmo was a

"great guy".  Class Action Compl. ¶ 86; Clarke Compl. ¶ 132-33.

As evidence of BOA's integration into Agape's affairs, the Plaintiffs highlight

two specific examples.  In December of 2008, given the state of the economy, a

number of Agape investors expressed interest in withdrawing their investments.  On

December 24, 2008, one such unnamed investor demanded that Agape return his

$200,000 investment.  An unnamed broker, acting on that investor's behalf,

approached Cosmo about returning the money and was directed to the BOA employee

staffed to Agape headquarters.  At Cosmo's request, the BOA representative issued

the broker a check for $162,500, which was then signed by Cosmo and delivered to

the investor.

In a separate incident, an unnamed Agape broker was advised by Cosmo that

an investor's withdrawal request was delayed because Agape was waiting on a $28

million payment from BOA in connection with a project in Maine.  Cosmo told the

broker that the redemption was delayed because the payment from BOA was

necessary to provide Agape with sufficient funds to pay the numerous investors

seeking redemptions.  When the broker approached the BOA representative to inquire

about this issue, he was told that the payment not yet been made.  However, the BOA

representative failed to inform the broker that the scheduled payment was for only $1

million and not the $28 million suggested by Cosmo.

Agape maintained 13 separate accounts with BOA; an operating account and 12 subsidiary accounts in the names of Agape brokers. At certain intervals, BOA permitted Cosmo to take monies from these subsidiary accounts and move them to the Agape operating account. Cosmo commingled these investors funds without segregating the money according to investor name or the purported loan for which the investment was secured. Cosmo also used this operating account to wire funds to Panama and Switzerland.

According to the Plaintiffs, a review of these accounts would have shown that Agape used investor deposits for: (1) significant wire transfers totaling $100 million or more; (2) personal payments to Cosmo; (3) interest payments to certain investors; and (4) payments to brokers. The Plaintiffs contend that these were "red flags" or badges of fraud that should have induced BOA to investigate Cosmo and Agape; particularly in light of Cosmo's criminal history and the well-publicized regulatory warnings concerning investment schemes.

## C. The Allegations Against MF Global

MF Global is a futures commission merchant ("FCM"), an entity that solicits or accepts orders for the purchase or sale of commodities. When Agape was inundated with requests for redemptions from investors, Cosmo started using investor funds to trade on the commodities market in order to generate revenues that would be sufficient to cover the calls from investors. MF Global established the commodities trading

accounts through which Cosmo executed these trades.  Through his trading activity, Cosmo lost $80 million on risky investments in the commodities market.

The Plaintiffs contend that, in opening the accounts, MF Global enabled Cosmo to operate as an unregistered commodities trader.  The Plaintiffs further contend that MF Global violated certain duties imposed by the common law and the CEA by establishing these accounts without investigating Cosmo.  According to the Plaintiffs, even a cursory investigation would have revealed that Cosmo was barred from associating with investment broker-dealers.

## II. DISCUSSION

### A.  Standard - Fed. R. Civ. P. 12(b)(6)

Under the now well-established <u>Twombly</u> standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).  The Second Circuit has explained that, after <u>Twombly</u>, the Court's inquiry under Rule 12(b)(6) is guided by two principles.  <u>Harris v. Mills</u>, 572 F.3d 66 (2d Cir. 2009) (citing <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice.'" Id. (quoting Iqbal, 129 S. Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." Iqbal, 129 S. Ct. at 1950.

## B. Negligence

Each of the Complaints assert negligence claims against BOA and MF Global. "To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) (quoting Solomon ex rel. Solomon v. City of New York, 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294, 499 N.Y.S.2d 392, 392 (1985)). Although a plaintiff must establish each of these discrete elements, "[t]he threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff?" Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232, 750 N.E.2d 1055, 727 N.Y.S.2d 7 (2001). In order to demonstrate this threshold element, "[t]he injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for '[w]ithout a duty running directly to the injured

person there can be no liability in damages, however careless the conduct or foreseeable the harm.'" Id. (quoting Lauer v. City of New York, 95 N.Y.2d 95, 100, 711 N.Y.S.2d 112, 733 N.E.2d 184 (2000)).

As the allegations against BOA and MF Global differ, the Court will address them separately.

### 1. Bank of America

BOA contends that the Plaintiffs' negligence claim must fail because **it** owed no legal duty to Cosmo's investors. The Plaintiffs recognize the general rule in New York that "'[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers." Lerner, 459 F.3d at 286 (quoting In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005)). Nevertheless, the Plaintiffs suggest that an important exception to this general rule is applicable in this case. In advancing this argument, the Plaintiffs rely on two cases—Lerner and In re Knox, 64 N.Y.2d 434, 477 N.E.2d 448, 488 N.Y.S.2d 146 (1985)—for the proposition that a financial institution *does* owe a duty to non-customers where it has "knowledge that funds it holds are being improperly misappropriated by a fiduciary." Class Pls. Mem at 26. However, the Plaintiffs' theory of liability rests on a misreading of these cases.

In Lerner, the Second Circuit noted that the negligence analysis is different in the context of *trust accounts* held by banks. Id. at 287. Citing In re Knox, 64 N.Y.2d

at 438, the Second Circuit explained that although a bank generally has no duty to monitor trust accounts in order to guard against misappropriation, "a bank may be liable for participation in such a diversion" if the bank had "notice or knowledge that a diversion" was intended or executed by its customer.  Id.  In such circumstances, "'[the bank] is under the duty to make reasonable inquiry and endeavor to prevent a diversion."  Id. at 287-88 (quoting Bischoff ex rel. Schneider v. Yorkville Bank, 218 N.Y. 106, 111, 112 N.E. 759, 760 (1916)).  The Plaintiffs argue that BOA's purported knowledge about Cosmo's suspicious account activity triggered a duty to monitor the Agape's accounts.

However, the problem with this argument is that Agape did not hold trust accounts with BOA.  Rather, the 13 Agape accounts referenced in the Complaints were merely conventional depository accounts.  Neither the Plaintiffs nor the Court have been able to locate a case which even suggests that New York law imposes upon banks a duty to protect non-customers from a fraud involving *depository* accounts. See Renner v. Chase Manhattan Bank, No. 98-CV-926, 1999 WL 47239, at *14 (S.D.N.Y. Feb. 3, 1999) (finding that the duty is only triggered where trust accounts are concerned).  Thus, the Court has no basis to depart from the general rule that banks do not owe non-customers a duty to shield them against intentional torts committed by bank customers.

The Plaintiffs also appear to contend that BOA breached a duty of care

imposed by the monitoring requirements of the Bank Secrecy Act, 31 U.S.C. § 5318.

However, because the Bank Secrecy Act does not create a private right of action, the

Court can perceive no sound reason to recognize a duty of care that is predicated upon

the statute's monitoring requirements.  See Aiken v. Interglobal Mergers and

Acquisitions, No. 05-CV-5503, 2006 WL 1878323, at *2 (S.D.N.Y. Jul. 5, 2006)

(finding that the Bank Secrecy Act did not create a private right of action and

therefore did not provide a basis for imposing a duty of care upon the defendant).

Accordingly, because the Plaintiffs have failed to allege that BOA breached a

cognizable legal duty, their negligence claims against BOA are dismissed.

### 2. MF Global

The Plaintiffs assert that MF Global breached duties of "ordinary and

reasonable care" in failing to investigate Cosmo before opening commodities trading

accounts on his behalf.  Class Action Compl. ¶ 178; Legurnic Compl. ¶ 163; Clarke

Compl. ¶ 285.  However, as with their claims against BOA, the Plaintiffs have failed

to allege an essential element of a negligence cause of action: the existence of a

cognizable legal duty owed to them by MF Global.

It is well-established that brokers such as MF Global do not owe a general duty

of care to the public at large.  Kolbeck v. LIT America, Inc., 923 F. Supp. 557, 571-72

(S.D.N.Y. 1996) (citing Moss v. Morgan Stanley, Inc., 719 F.2d 5, 15 (2d Cir.1983),

cert. denied, 465 U.S. 1025, 104 S. Ct. 1280, 79 L. Ed. 2d 684 (1984)).  Rather, "[a]

duty of care arises only when the broker does business with the plaintiff." Id. at 572.

Here, the Plaintiffs do not allege that they did business with MF Global. MF Global

therefore owed the Plaintiffs no duty whatsoever. Thus, even assuming that a cursory

inquiry would have revealed that Cosmo was not registered with the CFTC or that he

was barred from associating with an investment broker-dealer, MF Global's lack of

diligence may still not serve as the basis for a negligence claim against the company.

Accordingly, the Plaintiffs' negligence claims against MF Global must be dismissed.

## C. Aiding and Abetting Fraud

The Complaints allege that BOA and MF Global aided and abetted the fraud

committed by Cosmo and Agape. In order to survive the Defendants' challenges, the

Plaintiffs' fraud allegations must meet the requirements of Fed. R. Civ. P. 9(b) ("Rule

9(b)").

The heightened pleading standard contained in Rule 9(b) provides that "[i]n all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

stated with particularity." Rule 9(b) permits "[m]alice, intent, [and] knowledge," to be

averred generally. Fed. R. Civ. P. 9(b). However, because courts "must not mistake

the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a

license to base claims of fraud on speculation and conclusory allegations[,] . . .

plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."

Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation

marks and citation omitted).  A strong inference of fraud "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

In this context, recklessness is established by alleging conduct which is " 'highly unreasonable and which represents an extreme departure from the standard of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)).  Ultimately, a plaintiff carries a "significant burden . . . in stating a fraud claim based on recklessness."  Id. at 270.

In New York, to establish a claim of aiding and abetting fraud, a plaintiff must allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong.  Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983). Here, BOA and MF Global contend that the Complaints have failed to adequately allege the latter two elements.

### 1.  Bank of America

 New York law requires a plaintiff to establish that the aider and abettor had

*actual knowledge* of the alleged wrongdoing.  <u>Lerner</u>, 459 F.3d at 292 (citations

omitted); <u>see</u> <u>Wight v. Bankamerica Corp.</u>, 219 F.3d 79, 91 (2d Cir.2000) (observing

that "knowledge of the underlying wrong" is a "required element" under New York

law).  Rule 9(b) therefore requires the Plaintiffs to allege facts that give rise to a

strong inference that BOA had actual knowledge of Cosmo's fraud.  BOA

argues—and the Court agrees—that the Complaints have failed to meet this burden.

The Complaints allege that BOA established an unofficial branch within

Agape headquarters to provide on-site banking services.  This unofficial branch was

located within Agape's office space, had full access to BOA's systems and possessed

the ordinary capabilities of a conventional BOA branch.  The BOA employee staffed

to Agape's headquarters had access to Agape's business records and personal contact

with Agape employees, including Cosmo.  Notably, there is no allegation that this

unnamed BOA employee ever actually looked at Agape's business records or

discussed the fraud with Cosmo.

The Complaints further allege that actual knowledge of the fraud can be

inferred from the fact that Agape and BOA apparently shared proprietary information;

specifically, account information about their respective customers.  However,

although the information BOA allegedly provided to Cosmo about certain BOA

customers may have been useful in targeting his solicitations to well-heeled

prospective investors, it simply does not follow from this allegation that BOA must

have been aware of his fraudulent scheme.

As evidence of the unnamed BOA employee's actual knowledge of the fraud, the Complaints highlight two incidents. First, the Complaints point out that when a particular investor sought a redemption, it was the BOA employee—at Cosmo's direction—who issued the investor a check for $162,500. Second, the Complaints reference a conversation between the BOA employee and an unnamed broker in which the BOA employee apparently failed to correct the broker's misapprehension that the loan Agape was waiting for from BOA was for $1 million and not $28 million as the broker had been told by Cosmo. The apparent implication of these factual allegations is that the BOA employee was either in on the fraud or at least oblivious to certain "red flags" at Agape. Although these interactions *may* have given a prudent bank employee cause for concern, the Court does not believe that either of these allegations give rise to the strong inference that the BOA employee was complicit in Cosmo's scheme. These allegations also do not support a strong inference that the unnamed BOA employee was even cognizant of Cosmo's scheme. Indeed, courts have found much stronger allegations to be insufficient to establish actual knowledge.

In <u>Lerner</u>, investors brought a lawsuit against several banks arising from the banks' alleged involvement in a Ponzi scheme operated by attorney David Schick. 459 F.3d 273. Without recounting all of the details of Schick's scheme, it suffices to note that "to convince wary investors that their money was secure, [he] agreed to

deposit the entrusted funds in [attorney] escrow accounts . . ." Id. at 279. The

Plaintiffs alleged that the banks were aware of Schick's fraud because the banks had

actual knowledge that Schick had overdrawn the escrow accounts and also transferred

funds from these accounts to his personal accounts. Id. at 294. The Second Circuit

recognized that these hallmarks of misappropriation "may have put the banks on

notice that some impropriety" was taking place. Id. at 294. However, the Court found

that these alleged facts did not give rise to the strong inference that the banks had

actual knowledge of Schick's Ponzi scheme. Id. at 293-94.

In Ryan v. Hunton & Williams, No. 99-CV-5938, 2000 WL 1375265, at *16

(E.D.N.Y. Sept. 20, 2000), the plaintiffs brought a lawsuit against, among other

defendants, several banks that were connected to a Ponzi scheme operated by attorney

Cay Wolas. In sum, Wolas induced the plaintiffs and others to invest with him by

misrepresenting that their money would be used to purchase large shipments of Scotch

whiskey for resale in Asia. Id. In actuality, there was no whiskey; Wolas simply used

the investments to pay out earlier investors and used the remaining funds for unknown

purposes. Id.

Between May of 1994 and June of 1995, the defendant Chemical Bank had

various indications that Wolas and his associates were engaged in fraudulent conduct.

Id. at *1. In May of 1994, an associate of Wolas, John Dolan, tried to open a

corporate account at a Chemical branch. Id. However, Chemical declined to open the

account because the bank's in-house fraud unit suspected that the company was operating a scam.  Id.  In June of 1994, Chemical's Assistant General Counsel received word that Wolas had over-billed Chemical's predecessor for work done on a litigation matter.  Id.  Later that year, Chemical closed accounts maintained by Wolas and his family's business when a sizable check to Wolas drawn on the business account bounced.  Id.  In March of 1995, after Dolan and Wolas opened separate accounts at a Chemical branch in Manhattan, a branch officer referred these accounts to the bank's in-house fraud unit.  Id.  After an investigation, the Manhattan branch notified Dolan that the accounts had to be closed within one month.  Id.

Notwithstanding these allegations, the Court found that the plaintiffs failed to show that Chemical had actual knowledge of Wolas's fraud.  Id. at 9.  The Court reasoned that allegations showing Chemical had generalized suspicions about fraudulent activity did not suffice to raise an inference that the bank had actual knowledge of the fraudulent scheme Wolas was perpetrating.  Id.

In the Court's view, the allegations offered by the plaintiffs in Lerner and Ryan were manifestly stronger than the allegations offered by the Plaintiffs in this case. Here, the fact that Cosmo instructed the BOA employee to issue a sizable check to a dissatisfied investor does not give rise to the inference that the BOA employee must have had knowledge of Cosmo's scheme.  The Court is also unpersuaded that the BOA employee's failure to correct the broker's misapprehension about the size of the

impending loan from BOA supports the inference that she was somehow involved in or aware of the fraud. Nevertheless, the Class Action Plaintiffs assert that BOA consciously avoided certain "red flags" and that these allegations are sufficient to satisfy the knowledge prong of their aiding and abetting claim. The Court disagrees.

The Class Action Plaintiffs' conscious avoidance argument rests on <u>Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt, LLC</u>, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007). In that case, the Court rejected the defendants' claim that "conscious avoidance is the same as or similar to constructive knowledge and therefore insufficient for aiding and abetting claims." <u>Id.</u> In doing so, the Court explained that constructive knowledge is "'[k]nowledge that one using reasonable care or diligence should have," whereas conscious avoidance "occurs when 'it can almost be said that the defendant actually knew' because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." <u>Id.</u> (citations omitted). In light of the distinction between these states of mind, the Court found "no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers." <u>Id.</u> However, even assuming that <u>Fraternity Fund</u> is correct that allegations of conscious avoidance can, under certain circumstances, suffice to show actual knowledge, the factual allegations offered in the Complaints fall short of establishing that BOA possessed the requisite

state of mind.

The Complaints assert that a review of Cosmo's accounts with BOA would have revealed "red flags" or badges of fraud. The Complaints suggest that these "red flags" should have given BOA even greater cause for concern given that Cosmo had already been convicted of fraud. However, the allegations offered by the Plaintiffs merely show that BOA had *constructive knowledge* of Cosmo's scheme. The allegations do not suggest, as they must to show conscious avoidance, that BOA recognized the fraud but ignored it or failed to confirm it in order to later deny knowledge. Although these allegations, if true, may reflect unfavorably upon BOA's fraud monitoring regime, they do not create a strong inference that BOA had actual knowledge of Cosmo's scheme. Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98-CV-4960, 1999 WL 558141, at *7 (S.D.N.Y. July 30, 1999) (allegations that a bank knowingly or recklessly disregarded several "badges of fraud" in accounts involving millions of dollars did not give "rise to an inference, let alone a 'strong inference,' that the bank actually knew of, and participated in" the fraud); c.f. Mazzaro de Abreu v. Bank of Am. Corp., 525 F. Supp. 2d 381, 388 (S.D.N.Y. 2007) (finding that a plaintiff sufficiently alleged that a bank had actual knowledge of the purported fraud where the bank knew certain recipients of transfers were black market currency traders and advised the perpetrator of the fraud how to conceal its activities).

Even if the Complaints had alleged facts giving rise to a strong inference of

BOA's actual knowledge, BOA's acts and omissions did not rise to the level of providing substantial assistance to Cosmo's scheme.

Courts will find that a defendant provided substantial assistance where: "(1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed'; and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'" Rosner v. Bank of China, No. 06-CV-13562, 2008 WL 5416380, at *5 (S.D.N.Y. Dec. 18, 2008) (citing Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001), and Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 284 (2d Cir. 1992)).

Here, the Plaintiffs make much of the fact that BOA effectively maintained an unofficial branch within Agape headquarters. However, the Plaintiffs' factual allegations show only that the BOA employee staffed to the unofficial branch provided conventional banking services to Agape. The caselaw is clear that opening accounts and approving transfers, even where there is a suspicion of fraudulent activity, does not amount to substantial assistance. See Ryan, 2000 WL 1375265, at *9 (finding that opening accounts and approving transfers does not constitute substantial assistance, even where a bank had ample notice that the accounts may be associated with fraudulent activity). The fact that BOA provided many of these services on-site at Agape headquarters does not alter the Court's analysis.

The Plaintiffs also suggest that BOA provided substantial assistance by

ignoring the "red flags" of Cosmo's scheme. However, as the Court has already discussed, BOA had no affirmative duty to detect and thwart Cosmo's fraud. When a defendant has no such duty, their failure to act may not serve as the basis for claiming that the defendant provided substantial assistance. Rosner, 2008 WL 5416380, at *5 (citing Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d at 470, and Diduck 974 F.2d at 284).

The Plaintiffs further allege that an unnamed BOA employee told an unnamed investor that Agape was a "wonderful company" and that Cosmo was a "great guy". Class Action Compl. ¶ 86; Clarke Compl. ¶ 132-33. The apparent inference the Plaintiffs would like the Court to draw from this allegation is that BOA was actively recruiting investors for Agape. However, to the extent that this one statement even meets the specificity requirements of Rule 9(b), the Court finds that the statement was little more than puffery and falls well short of establishing that BOA provided substantial assistance to Cosmo's scheme.

Turning to the Plaintiffs' speculative allegation that Agape and BOA "apparently" shared customer information, the Court finds this claim insufficient to show that BOA was affirmatively aiding Cosmo's scheme. There is no allegation that the *Plaintiffs'* account information had been shared with Agape. The fact that BOA shared other investors' information with Agape cannot possibly serve as the proximate cause of the Plaintiffs' injuries. Rosner, 2008 WL 5416380, at *5 (citing Fezzani v.

Bear, Stearns & Co. Inc., 592 F. Supp. 2d 410, 432 (S.D.N.Y. 2008), and Bloor v.

Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62-63 (2d Cir. 1985))

(observing that "an alleged aider and abettor will be liable only where the plaintiff's

injury is a direct or reasonably foreseeable result of the defendant's conduct.").

The Plaintiffs have failed to adequately allege that BOA had actual knowledge

of Cosmo's scheme.  Nor have they adequately alleged that BOA provided substantial

assistance to that scheme.  Accordingly, BOA's motion to dismiss the Plaintiffs'

aiding and abetting fraud claim is granted.

### 2. MF Global

The Plaintiffs' aiding and abetting fraud claim against MF Global rests on the

theory that the company breached certain purported duties in order to consciously

avoid detecting Cosmo's scheme.  In particular, the Plaintiffs contend that a "simple

registration check" would have revealed that Cosmo was barred from associating with

any investment broker-dealer and that "a simple web search on Agape" would have

exposed the fact that the company was gathering investor money for short-term bridge

loans and not commodities trading.  Class Pls. Mem. at 14.  According to the

Plaintiffs, MF Global's alleged failure to adhere to certain regulatory requirements

gives rise to the strong inference that the company deliberately avoided detecting

Cosmo's fraud.  At best, these allegations show that MF Global had constructive

knowledge of Cosmo's fraud.  Although MF Global could perhaps have discovered

Cosmo's scheme by conducting a more diligent inquiry into Agape's affairs, this does not mean that MF Global had actual knowledge of the fraud.

The Plaintiffs' argument that MF Global had a duty to conduct a more diligent search is also unavailing. The Plaintiffs contend that National Futures Association Bylaw 1101 imposed upon MF Global a duty to investigate whether Cosmo and Agape were registered with the CFTC before opening trading accounts on their behalf. However, even generously assuming that Bylaw 1101 imposed such a duty, MF Global's breach does not give rise to the strong inference that the company's breach was motivated by a desire to avoid detecting Cosmo's scheme. Although it is clear that the Plaintiffs have not established that MF Global had actual knowledge of Cosmo's scheme, the aiding and abetting fraud claims must be dismissed for the additional reason that the Plaintiffs have failed to show that MF Global provided substantial assistance.

The Complaints allege that MF Global provided substantial assistance to the purported fraud in two ways. First, the Plaintiffs claim that MF Global affirmatively assisted the scheme by opening commodities trading accounts on behalf of Cosmo. Second, the Plaintiffs contend that MF Global assisted Cosmo's scheme by failing to discover that he was not registered with the CFTC and that he was barred from associating with any investment-broker dealers.

The simple allegation that Agape used trading accounts established by MF

Global to perpetrate the scheme is not, in and of itself, sufficient to show that MF Global provided substantial assistance.  In this sense, MF Global's remote involvement in the scheme is analagous to that of a bank whose accounts have been used to further a fraud.  In that scenario, as here, the passive role of opening an account does not provide substantial assistance to the underlying scheme.  See Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., 1999 WL 558141, at *7 (allegations that a bank allowed a customer to make suspicious wire transfers did not suffice to show that the bank provided substantial assistance to the underlying fraud); Williams v. Bank Leumi Trust Co., 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (citing DePinto v. Ashley Scott, Inc., 222 A.D.2d 288, 635 N.Y.S.2d 215, 217 (1st Dep't 1995)) (finding that "the mere fact that all the participants in the alleged scheme used accounts at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability.").

Moreover, the type of inaction alleged by the Plaintiffs amounts to substantial assistance only when the defendant owed the defrauded investor an independent duty to act.  Kolbeck, 923 F. Supp. at 247 (citations omitted).  Here, as the Court has already explained, MF Global owed no such duty to the Plaintiffs.  Therefore, MF Global's alleged failure to inquire into Cosmo's background did not constitute substantial assistance to his scheme.

Because the Plaintiffs have failed to allege two essential elements of their

aiding and abetting fraud claims, these claims are dismissed against MF Global.

**D.  Aiding and Abetting Breach of Fiduciary Duty**

A claim of aiding and abetting a breach of fiduciary duty is similar to a claim for aiding and abetting a fraud in that both causes of action require a plaintiff to allege actual knowledge, substantial assistance, and proximate causation.  <u>Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC</u>, 446 F. Supp.2d 163, 201 (S.D.N.Y. 2006) (collecting cases).  Here, the same allegations that comprise the Plaintiffs' aiding and abetting fraud claim are also offered to support their aiding and abetting a breach of fiduciary duty claim.  However, these allegations do not give rise to the inference that BOA and MF Global knowingly participated in Cosmo's alleged breach of his fiduciary duties.  Accordingly, the aiding and abetting a breach of fiduciary duty claims must be dismissed as against both BOA and MF Global.

**E.  Aiding and Abetting Commodities Fraud**

The Class Action Complaint alleges that BOA and MF Global aided and abetted Cosmo's alleged commodities fraud.  As a threshold matter, both BOA and MF Global contend that the Class Action Plaintiffs lack standing to assert such a claim under the CEA, 7 U.S.C. § 25(a)(1).

"CEA § 22 enumerates the only circumstances under which a private litigant may assert a private right of action for violations of the CEA."  <u>Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York</u>, 464 F.3d 255, 259 (2d Cir. 2006).  Section

22 provides, in pertinent part:

> [a]ny person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person-
>
> (A) who received trading advice from such person for a fee;
>
> (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;
>
> (C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of--
>
> (i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);
>
> (ii) a contract subject to section 23 of this title; or
>
> (iii) an interest or participation in a commodity pool; or
>
> (D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

7 U.S.C. § 25(a). As an initial matter, the Defendants suggest that the Class

Action Plaintiffs lack standing to sue under the CEA because the Class Action

Complaint fails to allege that the Plaintiffs and BOA or MF Global shared one of the

four relationships described in subsections (A) through (D). In order to answer this

threshold question, the Court must address whether a plaintiff may bring a private cause of action under § 22 against entities who aid and abet a violation of the CEA, even if the aider and abettor does not fit within any of the four categories enumerated above.

Several district courts that have analyzed this issue have determined that a plaintiff may bring a private cause of action under § 22 against persons or entities who aid and abet a violation only where the person or entity fits within subsections (A) through (D).  See In re Lake States Commodities, Inc., 936 F. Supp. 1461, 1467 (N.D.Ill. 1996); Davis v. Coopers & Lybrand, 787 F. Supp. 787, 794 (N.D.Ill. 1992). These courts found that the "'plain language' of § 22(a)(1) requires a plaintiff to demonstrate that [the aider and abettor] is one of the 'such person[s]' listed in subsections (A) through (D)."  Damato v. Hermanson, 153 F.3d 464, 469 (7th Cir. 1998) (explaining the rationale of In re Lake and Davis).  Addressing this same issue, the Seventh Circuit offered a different and—in the Court's view—more compelling interpretation of § 22.

In Damato, after a thoughtful and comprehensive look at § 22, the Seventh Circuit held that the statute "does not require that an aider and abettor independently satisfy subsections (A) through (D), but rather creates, on its own, a private cause of action against an aider and abettor who aids and abets a principal in undertaking one of the specifically enumerated transactions in subsections (A) through (D)."  153 F.3d

at 471.  In reaching this decision, the Court determined that "for the language of § 22 to make sense-and in order for our interpretation to recognize fully the intent of the Congress-'such person' in subsections (A) through (D) must refer to the principal and not the aider and abettor."  Id.  As the Court aptly explained, "to say that an aider and abettor can only be liable if it performs one of the actions listed in subsections (A) through (D) renders meaningless the words of the statute because the aider and abettor would then be a principal."  Id. at 470-71.

Here, the Court shares the Seventh Circuit's interpretation of § 22's standing requirements.  Thus, in order to establish standing to enforce a private right of action under the CEA against BOA and MF Global, the Class Action Plaintiffs must show that they were in one of the four enumerated relationships with the *primary violators*, Cosmo and Agape.  The fatal problem with the Class Action Plaintiffs' claim is that they do not fit within one of the relationships described in subsections (A) through (D).

The Class Action Plaintiffs do not allege that they have standing by virtue of subsections (A) or (D).  Nor could they plausibly do so.  Instead, the Class Action Plaintiffs rely on subsections (B) and (C).  The Class Action Plaintiffs claim to fall within subsection (B) because they allegedly made, through Cosmo, commodity futures contracts and deposited money with Cosmo in connection with an order to make such contracts.  However, as they readily concede, the Class Action Plaintiffs

were completely unaware that Cosmo was entering into commodity futures contracts with their investments; they believed that Cosmo was investing their money in bridge loans. In this sense, it is disingenuous to suggest that the Class Action Plaintiffs made a contract for the sale of a commodity. In the same vein, it was Cosmo, not the Class Action Plaintiffs, who deposited money in connection with an order to make commodity futures contracts; the Class Action Plaintiffs deposited money with Cosmo in connection with bridge loans.

Subsection (C) is equally unavailing. The Class Action Plaintiffs did not purchase through Cosmo, an interest or participation in a commodity pool. The Class Action Plaintiffs purchased an interest in bridge loans and Cosmo eventually misdirected their funds to purchase an interest in a commodity pool. Under these circumstances, the Class Action Plaintiffs have failed to properly allege that they have standing to assert a private right of action under § 22 of the CEA. See Tatum v. Legg Mason Wood Walker, Inc., 83 F.3d 121, 122-23 (5th Cir. 1996) (finding that the plaintiffs failed to state a claim for commodities fraud against an investment advisor where the advisor liquidated the plaintiffs' investments in stock and mutual funds in order to invest in the commodities market without their knowledge). Accordingly, the Class Action Plaintiffs' claim for aiding and abetting commodities fraud is dismissed.

**F. RICO**

The Clarke Complaint asserts a claim against BOA and MF Global for a

violation of the RICO statute.  RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ."  18 U.S.C. § 1962(c).

To establish a RICO violation, a plaintiff must show, among other elements, that the defendant has participated in the affairs of the alleged enterprise.  Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983).  The Supreme Court has held that "to conduct or participate, directly or indirectly, in the conduct" of an enterprise "one must participate in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993).  In the Second Circuit, the "'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear . . . especially at the pleading stage."  First Capital Asset Mgmt, Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004) (citing Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003), and De Falco v. Bernas, 244 F.3d 286, 309 (2d Cir. 2001)).  However, in order to clear this hurdle, the plaintiff must show that the RICO defendant played "some part in *directing* [the enterprise's] affairs."  Id. (quoting De Falco, 244 F.3d at 310) (emphasis added).

### 1.  Bank of America

The Clarke Complaint fails to allege that BOA directed the affairs of the purported enterprise.  At most, the Clarke Complaint alleges, albeit in conclusory

fashion, that BOA had actual knowledge of Cosmo's scheme and that BOA's actions (or inaction) aided the commission of his fraud.

In Madanes v. Madanes, 981 F. Supp. 241 (S.D.N.Y. 1997), the plaintiff alleged, among other claims, that lawyer Richard Ortoli and his law firms participated in a RICO enterprise operated by her brothers. In addition to providing conventional legal services to his clients, Ortoli was alleged to have been substantially involved in directing the purported enterprise. Id. at 257. In particular, the plaintiff alleged that Ortoli knowingly concealed fraudulent activities and even recommended certain courses of fraudulent behavior to his clients. Id. Collecting various cases, the Court determined that these allegations were insufficient to show that Ortoli and his law firms directed the purported enterprise. See Id. (quoting Strong & Fisher Ltd. v. Maxima Leather, Inc., No. 91-CV-1799, 1993 WL 277205, at *1 (S.D.N.Y. July 22, 1993) (noting that even a defendant with "substantial persuasive power to induce management to take certain actions" does not necessarily direct the affairs of an enterprise).

Here, the allegations against BOA are considerably less persuasive than those asserted against Ortoli. There is no allegation that BOA recommended certain courses of fraudulent behavior. Nor is there an allegation that BOA had the power to influence Cosmo or Agape. Even if the Court assumes that BOA consciously ignored the fraud or provided important services to aid in its commission, this would still be insufficient

to show that BOA directed or operated Cosmo's scheme. Under the circumstances, it is evident that the RICO claim asserted in the Clarke Complaint must be dismissed as against BOA.

### 2. MF Global

The Clarke Complaint's allegations against MF Global are even less compelling. The Clarke Complaint alleges that MF Global enabled Cosmo to perpetrate his purported scheme by opening commodities trading accounts on his behalf. However, simply alleging that a defendant provides "services which are helpful to an enterprise without any allegations that those entities exert any control over the enterprise does not sufficiently allege a claim under RICO against those entities." See City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 449 (2d Cir. 2008) (finding that a company and its CEO did not participate in a RICO enterprise where the company simply provided one of the defendants with internet services and software); Lesavoy v. Lane, 304 F. Supp. 2d 520, 534 (S.D.N.Y. 2004), aff'd in part and vacated in part on other grounds, 170 Fed. Appx. 721 (2d Cir. 2006) (finding that a broker that opened a commodities trading account for a defendant who was alleged to have breached various trusts did not direct the purported RICO enterprise). Here, as in Lesavoy, MF Global did nothing more than offer the conventional services of a broker and there is no allegation that even suggests that MF Global exerted control over the purported enterprise. Accordingly, the MF Global's

motion to dismiss the Clarke Complaint's RICO claim is granted.

## G. RICO Conspiracy

18 U.S.C. 1962(d) "makes it 'unlawful for any person to conspire to violate' the substantive provisions of RICO." United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009) (quoting 18 U.S.C. § 1962(d)). To establish the existence of a RICO conspiracy, a plaintiff must prove "the existence of an agreement to violate RICO's substantive provisions." Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,187 F.3d 229, 244 (2d Cir. 1999). In other words, the Clarke Plaintiffs must show that BOA and MF Global "agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with" the purported enterprise. Id. Here, the Clarke Complaint contains no factual allegations to support the notion that BOA or MF Global made such an agreement with Cosmo. Accordingly, the Clarke Plaintiffs' RICO conspiracy claim is dismissed.

## H. Leave to Amend the Complaints

As an alternative to dismissing the Complaints, the Plaintiffs have requested the opportunity to amend the pleadings in order to amplify their allegations. In general, leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, leave to amend may be denied if the amendment would be futile. See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603-04 (2d Cir. 2005) (explaining that a request for leave to amend may be

denied where the proposed amendment would be futile).

Here, it would be futile to grant the Plaintiffs leave to amend the Complaints in order to amplify their negligence claims. The Court has determined that BOA and MF Global owed no duty to the Plaintiffs that could possibly give rise to a viable negligence claim. The proposed amendment to the Clarke Plaintiffs' RICO claim would be futile as well because it is clear that BOA and MF Global did not direct the purported RICO enterprise. Likewise, granting the Class Action Plaintiffs leave to re-plead their aiding and abetting commodities fraud cause of action would be futile because they lack standing to assert such a claim. The Court also believes that any amended claim against MF Global for aiding and abetting fraud or aiding and abetting a breach of fiduciary duty would not survive a motion to dismiss. However, the Plaintiffs' aiding and abetting fraud and aiding and abetting a breach of fiduciary duty claims against BOA present a different question.

Although the Court has serious doubts about whether the Plaintiffs can offer factual allegations that would give rise to the strong inference that BOA had actual knowledge of or provided substantial assistance to Cosmo's scheme, the Court will afford the Plaintiffs one opportunity to amend only these two claims. Accordingly, the Court grants the Plaintiffs leave to file amended pleadings for the limited purpose of adding or amplifying factual allegations that bear on their claims against BOA for aiding and abetting fraud and aiding and abetting a breach of fiduciary.

37

### III.  CONCLUSION

The motions by BOA and MF Global to dismiss the three Complaints are granted.  However, the Court will afford the Plaintiffs one opportunity to file amended pleadings for the sole purpose of adding or amplifying factual allegations that bear on their claims against BOA for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.  The amended pleadings shall be filed within 30 days of the date of this order.

**SO ORDERED.**

Dated: Central Islip, New York
      January 29, 2010

                        */s/ Arthur D. Spatt*
                        ARTHUR D. SPATT
              United States District Judge